IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:25-cv-00555-FL

THOMAS RAY SANDERS, JR.,

*Plaintiff*,

v.

C.D. ROBINSON, in his individual capacity,

*Defendant*.

**BRIEF IN SUPPORT OF
MOTION TO DISMISS AND
MOTION TO STRIKE BY
DEFENDANT C.D. ROBINSON**

NOW COMES the defendant identified in Plaintiff Thomas Ray Sanders, Jr.'s Amended Complaint as C.D. Robinson, in his individual capacity, by and through undersigned counsel, and submits this Brief in support of his Motion to Dismiss pursuant to Rule 12(b)(6) and Motion to Strike pursuant to Rule 12(f) of the Federal Rules of Civil Procedure.

## PROCEDURAL POSTURE

Plaintiff's Amended Complaint asserts two claims against Officer Robinson in his individual capacity: a section 1983 Fourth Amendment excessive force claim (First Claim for Relief) and state law assault and battery, with "negligence" pled in the alternative (Second Claim for Relief). The alleged claims relate to a seizure on December 19, 2022, outside a Super 8 Motel in Raleigh, North Carolina.

## PLAINTIFF'S ALLEGATIONS

Plaintiff alleges that on December 19, 2022, Raleigh Police Officer C.D. Robinson used excessive force during an on-scene encounter outside a Super 8 Motel by first slapping Plaintiff's phone from his hand while he was recording and then "slamming" Plaintiff face-first to the ground, causing a split lip and misaligned teeth. [D.E. 30, ¶¶ 1].

According to the Amended Complaint, Plaintiff and his teenage cousin paid for a room at the Super 8 after a late shift delivering food on December 18, 2022, overslept checkout, and were told by management the next morning to leave. [D.E. 30, ¶¶ 9–10]. When Raleigh Police Department officers arrived, Plaintiff and his cousin gathered their belongings, left the room as instructed, and were then followed by officers who demanded—under threat of arrest—that they identify themselves. [D.E. 30, ¶¶ 11–12]. Plaintiff alleges that the most the officers could suspect was misdemeanor trespass, characterizing it as a nonviolent offense; he says his cousin declined to identify himself, was handcuffed and pinned, and that Plaintiff recorded as Officer Robinson drove his elbow and knee into the cousin's head and back. [D.E. 30, ¶¶ 13–16]. Plaintiff claims Officer Robinson shoved him while ordering him to "back up," slapped his phone away as he continued recording, abruptly pulled Plaintiff's hands behind his back, and then slammed him face-first into a large tree root and kneed him in the back, all while Plaintiff, a 5'5", 135-pound, unarmed twenty-year-old, never attempted to touch Officer Robinson, never attempted to flee or resist arrest, and was at all times within Officer Robinson's control. [D.E. 30, ¶¶ 17–22]. Plaintiff alleges he was taken to WakeMed, where clinicians documented abrasions to his cheek, temple, chin, and lips and a two-centimeter chin laceration, and he reported that his lower teeth felt "out of alignment" and "pushed in." [D.E. 30, ¶ 23].

Separate from and unrelated to the events of December 19, 2022, footnote 1 to Paragraph 21 of the Amended Complaint inserts allegations about an incident involving Darryl Williams, references a separate lawsuit, notes its settlement amount, and offers argument about Rule 404(b)(2). [D.E. 30 ¶ 21, n.1].

Officer Robinson has identified and preserved forty video recordings related to the encounter and its immediate aftermath.[1] Their authenticity is not in dispute. The Amended Complaint presents a timeline narrative of a single, discrete encounter and ties both the federal and state claims to that precise sequence, rendering the videos integral under binding Fourth Circuit precedent. *See Doriety for Estate of Crenshaw v. Sletten*, 109 F.4th 670, 679–80 (4th Cir. 2024) (a district court can consider a video submitted at the motion to dismiss stage when (1) the video is "integral" to the complaint and its authenticity is not challenged, and (2) to the extent that the video "clearly depicts a set of facts contrary to those alleged in the complaint," or "blatantly contradicts" the plaintiff's allegations, rendering the plaintiff's allegations implausible).

The first recording, identified as Video 1 (Ramge bwc), is Officer Ramge's body worn camera footage capturing his initial interaction with Plaintiff Sanders and his cousin, Bell, at the motel. At approximately 1:00, the motel manager states he wants both Plaintiff and Bell trespassed. At approximately 1:08, Officer Ramge informs Plaintiff and Bell that he needs their names because they are being trespassed from the property. The recording thus shows both the manager and Officer Ramge clearly stating that Plaintiff and Bell are trespassed from the motel. This context, which the Complaint's narrative omits, explains why officers asked for

---

[1] Officer C.D. Robinson is requesting leave to manually file the following item labeled as Exhibit A to his Motion to Dismiss and Motion to Strike: a flash drive containing Raleigh Police Department video recordings depicting Plaintiff, including in the incident described in the Amended Complaint.

On February 8, 2023, an Order on Petition for Release of Custodial Law Enforcement Agency Recording was entered in the Superior Court of Wake County in case number 23 CVS 1283. A copy of the Order was filed as Attachment 1 to Defendant C.D. Robinson's Notice of Manual Filing. [D.E. 20-1].

identification and followed Plaintiff and Bell as they left the motel room. The recording further shows Plaintiff and Bell understood they were being trespassed and why the officers requested their names. The Complaint asserts officers "demanded—under threat of arrest—that they identify themselves," [D.E. 1, ¶ 12], without adequate factual predicate. The Amended Complaint also downplays trespass to a minor, nonviolent suspicion while presenting the later interactions as unprovoked. [D.E. 1, ¶¶ 13, 22].

The integral video supplies the objective contemporaneous predicate: a manager-requested trespass and an officer's direct communication that names were needed because of that trespass. To the extent the Amended Complaint suggests officers gratuitously followed and demanded identification, Video 1 provides the necessary context that renders such an insinuation implausible.

The second recording, identified as Video 3 (Robinson (BWC)), is Officer Robinson's body worn camera footage depicting his interaction with Plaintiff in the minutes before detention, specifically from approximately 1:00 to 3:02. The recording shows that when Officer Robinson physically redirects Plaintiff backward while issuing commands to "back up," Plaintiff repeatedly steps back toward Officer Robinson, closing the distance rather than maintaining separation. The video captures multiple verbal commands before any restraint is used, including in the segment from 1:53 to 1:57. The audio records Plaintiff cursing and shouting while moving toward Officer Robinson and reaching out. At 2:00, Plaintiff states, "You better put your hands off of me. Fuck wrong with you? Don't know what the fuck y'all think you're doing. Fuck all of you," while stepping toward Officer Robinson and Bell. At 2:46, Plaintiff says, "Bro stop pushing me though bruh. Like the fuck. Don't push me bruh. Don't fucking push me bruh. Like for real," and at 2:51 he grabs Officer Robinson's hand. At 2:57, Plaintiff demands, "Sir did I put

4

my hands on you? Did I put my hands on you? Bruh stop putting your fucking hands on me," while reaching out. At 2:59, he grabs Officer Robinson's wrist, thrusts his arm holding the phone at three minutes and again grabs Officer Robinson's wrist during restraint at approximately 3:02. This sequence directly contradicts the Amended Complaint's repeated assertions that Plaintiff never attempted to touch Officer Robinson, never resisted, and was always within Officer Robinson's control. The video shows the opposite on these discrete points: repeated encroachment after commands to back up, grabbing Officer Robinson's wrist and hand, and persistent movement toward Officer Robinson while cursing, shouting, and reaching. These are concrete, observable facts captured on the recording.

## ARGUMENT

### I.     Standard of Review and Use of Video Evidence

A complaint must state a plausible claim to survive a Rule 12(b)(6) motion to dismiss. In considering the motion, "courts view the allegations of the complaint as true," but "[c]ourts may also consider documents outside the pleadings without converting a motion to dismiss into one for summary judgment if those documents are 'integral to the complaint and authentic.' " *Doriety v. Sletten*, 2023 WL 4872569, *1 (M.D.N.C. July 28, 2023). The Court thus may disregard Plaintiff's specific allegations that are contradicted by the record after viewing the body worn camera footage.  As this Court has held, when a videotape contradicts a plaintiff's alleged facts, the Court will disregard those allegations when ruling on a dispositive motion. *Hicks v. City of Kinston*, 2022 WL 3951359, *4 n.7 (E.D.N.C. Aug. 31, 2022).[2]

---

[2] This case is thus unlike cases where there is no body worn camera footage and the Court must view the facts in the light most favorable to the plaintiff when two competing versions of the facts are offered up by each side.  *See, e.g., Harris v. Pittman*, 927 F. 3d 266 (4th Cir. 2019). However Plaintiff frames the allegations in this case, the video recordings show what occurred.

In this case, the entirety of the claim rests on what happened as captured on video. Officer Robinson is submitting 40 videos to the Court for review as Exhibit A to his Motion to Dismiss. The videos have been authenticated. *See* Exhibit B, Declaration of J.T. Maultsby.[3] The videos provide the best evidence of what happened and blatantly contradict several allegations in the Amended Complaint. The integral videos are presented in full for the temporal windows relevant to the Amended Complaint's allegations. Multiple angles are provided to ensure a fair and complete view of the encounter.

The Amended Complaint's theories against Officer Robinson are sequence- and conduct-dependent. On the federal claim, the objective reasonableness analysis set forth in *Graham v. Connor*, 490 U.S. 386 (1989), turns on factors such as the severity of the suspected offense, whether the suspect posed an immediate threat, and whether he actively resisted or attempted to evade arrest. The Amended Complaint narrates the encounter and asserts that Plaintiff never attempted to touch or resist Officer Robinson and was always under control, while Officer Robinson used force without justification. The integral videos establish unambiguous facts relevant to *Graham*'s factors that the Amended Complaint omits or contradicts.

Video 1 shows that, from the outset, the officers were addressing a manager-requested trespass, that Plaintiff and Bell were told they were being trespassed, and that names were requested for that reason. Video 3 shows Plaintiff repeatedly stepping toward Officer Robinson in defiance of commands to back up, cursing and shouting at close range, and grabbing Officer Robinson's hand and wrist multiple times. These facts bear directly on whether Plaintiff posed an immediate threat at the moments in question and whether he was actively resisting by

---

[3] In support of his Motion to Dismiss and Motion to Strike, Officer Robinson filed Exhibit B, Declaration of J.T. Maultsby, as a records custodian declaration to authenticate the video recordings manually filed as Exhibit A to his Motion to Dismiss the original Complaint. [D.E. 29-2].

physically engaging Officer Robinson and refusing to comply with distance and non-contact directives.

At the motion to dismiss stage, the use of the video recordings is limited and appropriate. The Court is not asked to weigh credibility or resolve disputed inferences. Instead, the Court is asked to accept what the recordings clearly depict about discrete, outcome-determinative facts that the Amended Complaint places at issue but misstates or omits. Those fixed facts are then applied to the legal standards governing the claims Officer Robinson seeks to dismiss now.

Where, as here, the video plainly depicts the discrete conduct at issue, the Court may credit that depiction to the extent it renders contrary allegations implausible. The Amended Complaint's categorical assertions that Plaintiff "never attempted to touch Officer Robinson," "never resisted arrest," and was "always within Officer Robinson's control" cannot coexist with a recording that shows Plaintiff reaching out, grabbing Officer Robinson's hand and wrist, thrusting his arm and phone, persistently encroaching after commands to back up, and ignoring multiple verbal directives. The integral videos thus foreclose, or at least narrow, the Amended Complaint's most sweeping factual assertions about non-resistance and non-contact.

## II. <u>Claims of Excessive Force by Law Enforcement Officer and Qualified Immunity</u>

When analyzing claims that a law enforcement officer used excessive force, courts generally engage in two analyses:  whether the use of force was objectively reasonable under the Fourth Amendment and whether the officer is entitled to qualified immunity.

### A. *Plaintiff cannot establish a violation of the Fourth Amendment*

Claims asserting that a law enforcement officer has violated a person's Fourth Amendment rights to be free from excessive force are analyzed under the standard of "objective reasonableness."  *Graham*, 490 U.S. at 395.  In applying this standard, a court gives "careful

attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Further, [t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.*

The first *Graham* factor, the severity of the crime at issue, supports a legitimate governmental interest in the officers' initial engagement and commands. Video 1 (Officer Ramge) establishes that, at approximately the one-minute mark, the motel manager expressly requested that Plaintiff Sanders and his cousin, Bell, be trespassed from the property, and, at approximately 1:08, Officer Ramge told both men he needed their names because they were being trespassed. The video shows both the manager and Officer Ramge communicating the trespass. These facts, omitted from the Amended Complaint's narrative, explains why the officers followed Plaintiff and Bell and requested identifying information as they left the motel. While trespass is nonviolent offense, *Graham* does not require a serious felony to justify reasonable control measures during a lawful investigatory encounter. The trespass context supplied by Video 1 makes clear the officers were addressing a legitimate property complaint and needed to document identities for the trespass, which reasonably informed their commands to maintain distance and provide names.

With respect to the second *Graham* factor, whether the suspect posed an immediate threat, Video 3 (Officer Robinson) shows events relevant to that assessment for the critical pre-detention window from approximately 1:00 to 3:02. The recording shows Officer Robinson issuing repeated directives to "back up" while physically redirecting Plaintiff backward to create

8

space. Each time, Plaintiff returns to step toward Officer Robinson, closing distance rather than maintaining it. The video and audio capture Plaintiff moving toward the officer while cursing and shouting at close range. At approximately 1:53 to 1:57, Officer Robinson issues multiple verbal commands before any force is used. At approximately 2:00, while stepping toward Officer Robinson and Bell, Plaintiff says, "You better put your hands off of me… Fuck all of you." At approximately 2:46, Plaintiff continues advancing and says, "Bro stop pushing me… Don't push me bruh… Like for real," and at approximately 2:51 he grabs Officer Robinson's hand. At approximately 2:57, he demands, "Sir did I put my hands on you? Did I put my hands on you? Bruh stop putting your fucking hands on me," while reaching out; at approximately 2:59 he grabs Officer Robinson's wrist; at approximately 3:02 he thrusts his arm holding the phone and again grabs Officer Robinson's wrist as restraint begins. Persistent encroachment after explicit distance commands, coupled with repeated grabbing of an officer's hand and wrist and continued reaching at the officer, reflect an immediate safety concern a reasonable officer could credit. Under *Graham*, officers need not wait for a blow to land before taking control measures when a suspect at arm's length repeatedly ignores commands to keep distance and initiates physical contact.

The third *Graham* factor, active resistance or attempted flight, also weighs against Plaintiff's non-resistance narrative. The same Video 3 sequence shows repeated noncompliance with clear commands to "back up" and multiple instances of Plaintiff grabbing Officer Robinson's hand and wrist while continuing to step toward him. That conduct is active resistance to an ongoing seizure. *Graham* recognizes that active resistance justifies a proportionate increase in force to gain control, particularly where the resistance itself exacerbates the immediacy of the threat at close range. Although Plaintiff at times says "stop pushing me," he does not disengage

or comply; instead, he advances and initiates contact. On this record, the integral video contradicts the Amended Complaint's categorical assertions that Plaintiff never attempted to touch Officer Robinson, never resisted, and was always within the officer's control during the pre-detention sequence.

Video 1 supplies the contemporaneous trespass predicate and the officers' stated need for names, undercutting any insinuation that the follow-up and commands lacked a lawful basis. Video 3 demonstrates incremental, tempered measures before restraint, including verbal commands and physical redirection to create space, followed by control efforts when Plaintiff persisted in closing distance and grabbing at Officer Robinson. Judged from the perspective of a reasonable officer on the scene and allowing for split-second decisions in a tense, evolving encounter, *Graham* permits officers to employ reasonable force to establish control when a noncompliant subject at arm's length repeatedly ignores commands to maintain distance and initiates physical contact with the officer.

The video recordings establish the material facts and, applied to *Graham*'s factors, forecloses Plaintiff's non-resistance narrative. On those facts, Officer Robinson's measured control efforts were objectively reasonable. At minimum, no clearly established law would have put a reasonable officer on notice that the incremental force used in response to close-range encroachment and grabbing was unconstitutional. The section 1983 excessive force claim therefore fails as a matter of law, or, alternatively, is barred by qualified immunity.

**B.** ***Based on the evidence properly considered at this stage, Officer Robinson is entitled to qualified immunity***

An officer who uses force is entitled to qualified immunity when his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (quoting *Mullenix v. Luna*, 577 U.S. 7,

11 (2015) (internal quotations omitted)). To show that a right was clearly established, a plaintiff must show that "existing precedent must have placed the statutory or constitutional question beyond debate," such that "all but the plainly incompetent or those who knowingly violate the law" would not be entitled to qualified immunity. *Id.* (internal quotations and citation omitted). In deciding whether a right is clearly established, a court must not look at the right " 'at a high level of generality,' " but it must be " 'particularized' to the facts of the case." *Id.* (citation omitted). In other words, if it denies qualified immunity to an officer, a court should "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment" such that the officer had notice that what he was doing was wrong. *Id.*

To the extent the Court considers whether the integral recordings would permit early resolution of qualified immunity, Officer Robinson preserves that defense. "A ruling on a defendant's claim of qualified immunity should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive." *Green v. Beck*, 2011 WL 666258, *2 (E.D.N.C. Feb. 14, 2011), *aff'd*, 539 F. App'x 78 (4th Cir. 2013) (holding that "defendants are entitled to resolution of their defense of qualified immunity before being subject to the burdens of litigation, including discovery."). "Because qualified immunity is an immunity from suit, and not merely a defense to liability, courts must scrutinize and dismiss appropriate cases on qualified immunity grounds early in the litigation." *Sigman v. Town of Chapel Hill*, 161 F.3d 762, 786 (4th Cir. 1998). A court must "give a qualified immunity defense a hard look at an early stage in the litigation," or otherwise "it risks the forfeiture of some of the protections afforded by the defense because the immunity includes 'an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question.' " *Id.* (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)). This includes addressing a

defendant's immunity defense pursuant to a motion to dismiss under Rule 12(b)(6). *Id. See also Pittman v. Nelms*, 87 F. 3d 116, 119 (4th Cir. 1996) (stating, "One of the purposes of immunity … is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit[.]" (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991))).

The videos demonstrate that if the Court considers integral evidence now, they correct critical facts such as trespass context, repeated commands, proximity, encroachment, and grabbing, that frame the *Graham* reasonableness and clearly established law analysis.

## III.     Officer Robinson is Entitled to Public Official Immunity

Under North Carolina law, law enforcement officers are protected from individual liability under the doctrine of public official (or officer's) immunity unless their actions were malicious, corrupt, or outside the scope of their duties. *Pritchard v. Mobley*, 595 F. Supp. 3d 438, 452 (E.D.N.C. 2022) (citing *Bailey v. Kennedy*, 349 F. 3d 731, 742 (4th Cir. 2003). Even if an officer is mistaken and thus negligent about the use of force, he is immune unless one of the three exceptions applies. *White v. City of Greensboro*, 532 F. Supp. 3d 277, 306 (M.D.N.C. 2021). *See also Russ v. Causey*, 468 F. App'x 267, 269 (4th Cir. 2012) (citing three exceptions for "personal liability" under "public officers' immunity doctrine").

There is no dispute that Officer Robinson was acting within the course and scope of his official duties and not corruptly. Nor is there evidence that his conduct was malicious since malice requires a showing that "a man of reasonable intelligence would know [that he was acting] … contrary to his duty." *Mobley*, 595 F. Supp. 3d at 452.

Further, because public officer's immunity "is 'functionally identical' to the federal qualified immunity analysis," equivalent claims under state law are thus "subsumed within the

federal excessive force claim[s]." *Id.* at 453 (quoting *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013)). If Officer Robinson is entitled to qualified immunity, "the same result follows for … state law tort claim[s]." *Id.*

## IV.    Plaintiff's Negligence Claim Fails

The integral video underscores why the negligence claim against Officer Robinson fails as a matter of law. The Amended Complaint pleads intentional applications of force. The videos reinforce that the interactions were volitional, not accidental, and that Officer Robinson was performing discretionary duties in a dynamic encounter while issuing commands, managing distance, and responding to physical contact by Plaintiff. North Carolina public official immunity bars personal liability for negligence in such circumstances absent plausible allegations of malice or conduct outside the scope of official duties, and the facts pled sound in intentional tort. The videos confirm that the negligence count is an impermissible repackaging of intentional conduct that rises or falls, if at all, as an intentional tort claim, not as negligence.

Moreover, Officer Robinson cannot "use[] excessive force against Plaintiff negligently," [D.E. 30, ¶ 40], where the use of force was objectively reasonable and not violative of the Fourth Amendment. *See, e.g., Williams v. City of Jacksonville Police Dep't*, 165 N.C. App. 587, 594–95 (2004).

## V.    The Court Should Strike Footnote 1 to Paragraph 21 Under Rule 12(f)

Rule 12(f) authorizes striking immaterial, impertinent, or scandalous matter where the challenged material bears no relation to the claims and would prejudice a party by injecting collateral issues or inflaming the record. *See* Fed. R. Civ. P. 12(f).

The unrelated, post-incident allegation about a different episode and a separate lawsuit is immaterial to the claims pled here, invites unfair prejudice, and portends collateral discovery that

would distract from the recorded motel encounter. With integral recordings fixing what occurred in this case, there is no justification for keeping immaterial, impertinent, scandalous, unnecessary, and inflammatory allegations about another case in the Amended Complaint. The allegations of footnote 1 to Paragraph 21 have no bearing on any element of the claims arising from the December 19, 2022, motel encounter. The allegations neither advance the plausibility of Plaintiff's excessive force or state tort theories nor cure any pleading deficiency.

The First Claim for Relief turns on whether Officer Robinson's force in this discrete event was objectively reasonable under the Fourth Amendment. The intentional tort theory of the Second Claim for Relief turns on whether Officer Robinson committed assault and battery during the same sequence. The separate incident referenced in footnote 1 to Paragraph 21 involves a different person, different facts, a different date, and different alleged tactics. It does not render any element of the pleaded claims more or less probable. The only practical effect is to inject prejudicial character and propensity material and invite collateral discovery.

The integral videos reinforce the rationale for striking footnote 1 to Paragraph 21. That footnote's allegations about a separate, later incident and pending litigation have no bearing on whether the force used in this discrete, recorded motel encounter was unreasonable, violative of the Constitution, or otherwise tortious. The prejudice and propensity risks posed by footnote 1 to Paragraph 21 are heightened when the Court has contemporaneous recordings of the pled encounter that objectively fix the material facts. The Court should strike footnote 1 to Paragraph 21 pursuant to Rule 12(f).

<u>**CONCLUSION**</u>

The body worn camera recordings are integral to the Amended Complaint because the claims hinge on the precise encounter they contemporaneously recorded. Their authenticity is

established. They clearly depict outcome-determinative facts the Amended Complaint omits or contradicts, including the motel manager's trespass request and officers' communication of that fact to Plaintiff Sanders and Bell, the reason officers requested names and followed them, repeated commands to "back up" before any restraint, Plaintiff's persistent encroachment toward Officer Robinson while cursing and shouting, and Plaintiff's grabbing of Officer Robinson's hand and wrist. Those fixed facts foreclose Plaintiff's categorical assertions of non-resistance and non-contact and warrant dismissal and striking as requested.

Officer Robinson respectfully requests that the Court grant his Motion to Dismiss and enter an order dismissing the claims against him pursuant to Rule 12(b)(6) and striking footnote 1 to Paragraph 21 pursuant to Rule 12(f).

Respectfully submitted, this the 2nd day of January, 2026.

/s/ *Sonny S. Haynes*
Sonny S. Haynes
N.C. State Bar No. 41303
Rachel E. Keen
N.C. State Bar No. 27777
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC 27101
Telephone: (336) 721-3632
Facsimile: (336) 726-2227
E-mail: Sonny.Haynes@wbd-us.com
E-mail: Rachel.Keen@wbd-us.com
*Attorneys for Defendant C.D. Robinson*

15

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on this 2nd day of January, 2026, the foregoing **BRIEF IN SUPPORT OF MOTION TO DISMISS AND MOTION TO STRIKE BY DEFENDANT C.D. ROBINSON** was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of said filing to all Counsel of record.

/s/ *Sonny S. Haynes*
Sonny S. Haynes
N.C. State Bar No. 41303
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC  27101
Telephone: (336) 721-3632
Facsimile: (336) 726-2227
E-mail:   Sonny.Haynes@wbd-us.com
*Attorney for Defendant C.D. Robinson*

16